# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

**Goldfine v. Barack, Ferrazzano, Kirschbaum & Perlman**, 2013 IL App (1st) 111779

---

| | |
|---|---|
| Appellate Court Caption | MORTON GOLDFINE and ADRIENNE GOLDFINE, Plaintiffs-Appellants and Cross-Appellees, v. BARACK, FERRAZZANO, KIRSCHBAUM AND PERLMAN, PETER BARACK, DENNIS FERRAZZANO, HOWARD KIRSCHBAUM, CHARLES PERLMAN, RAY RAZNER, DEBRA CAFARO, DAVID NADOFF, THOMAS PAGE, DAVID SELMER, ROBERT SHAPIRO, WENDI SLOANE WEITMAN, and JILL ANN COLEMAN, Defendants-Appellees and Cross-Appellants. |
| District & No. | First District, Sixth Division<br>Docket No. 1-11-1779 |
| Filed | June 28, 2013 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Plaintiffs proved their claims for a violation of the Illinois Securities Law and for legal malpractice arising from defendant law firm's failure to preserve plaintiffs' right to recover for the securities violation, and the award of statutory damages, attorney fees, costs and expenses was affirmed; however, the cause was remanded for application of the correct formula for calculating the mandatory statutory damages pursuant to the Illinois Securities Law, a recalculation of the award for attorney fees, and an opportunity for plaintiffs to file a petition under the Illinois Securities Law for additional attorney fees and costs for defending the appeal. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 05-L-6360; the Hon. Dennis J. Burke, Judge, presiding. |

| | |
|---|---|
| Judgment | Affirmed in part and reversed in part; cause remanded with directions. |
| Counsel on Appeal | Law Offices of Edward T. Joyce & Associates, P.C. (Edward T. Joyce and Rowena T. Parma, of counsel), and Martin J. Oberman, both of Chicago, and Steven J. Plotkin, of Evanston, for appellants. |
| | Jenner & Block LLP, of Chicago (Jeffrey D. Colman, Barry Levenstam, and Irina Y. Dmitrieva, of counsel), for appellees. |
| Panel | PRESIDING JUSTICE LAMPKIN delivered the judgment of the court, with opinion. |
| | Justice Reyes concurred in the judgment and opinion. |
| | Justice Gordon concurred in part and dissented in part, with opinion. |

## OPINION

¶ 1    This is a legal malpractice case based on an underlying cause of action for a violation of the Illinois Securities Law of 1953 (Illinois Securities Law) (815 ILCS 5/1 *et seq.* (West 2010)). Plaintiffs Morton and Adrienne Goldfine brought a legal malpractice action against defendants, the law firm of Barack, Ferrazzano, Kirschbaum & Perlman (BFKP) and several partners of that law firm, to recover damages plaintiffs sustained as a result of defendants' failure to preserve plaintiffs' Illinois Securities Law cause of action against Shearson Lehman Brothers Holdings, Inc., and others.

¶ 2    The trial court found that plaintiffs proved their underlying Illinois Securities Law claim and ruled in their favor on their legal malpractice claim. The trial court awarded them statutory damages for their Illinois Securities Law claim and attorney fees, costs and expenses.

¶ 3    On appeal, plaintiffs argue that the trial court erred (1) in calculating the amount of their mandatory statutory award for damages under the Illinois Securities Law, and (2) in denying their full claim for attorney fees, costs and expenses.

¶ 4    In their cross-appeal, defendants argue that the award of interest, attorney fees and costs should be reversed because the fee-shifting and interest provisions of the Illinois Securities Law are punitive and coercive and, thus, fall within the category of damages that are barred by statute in legal malpractice actions. Defendants also argue that the trial court erred in finding that plaintiffs proved (1) their underlying Illinois Securities Law claim where Mr. Goldfine's reliance on his broker's representations concerning stock purchases was not reasonable, and (2) that defendants' legal malpractice proximately caused plaintiffs' damages.

¶ 5    For the reasons that follow, we reject defendants' argument that the award of statutory damages under the Illinois Securities Law is barred by statute in legal malpractice actions. We also affirm the trial court's findings that plaintiffs proved their underlying Illinois Securities Law claim and legal malpractice action. Further, we affirm the trial court's award of plaintiffs' costs and expenses. However, we find that the trial court failed to apply the correct mathematical formula to calculate plaintiffs' mandatory statutory award for damages under the Illinois Securities Law. Specifically, the clear and unambiguous language of section 13(A) of the Illinois Securities Law (815 ILCS 5/13(A) (West 2010)) required the circuit court to calculate plaintiffs' award of 10% interest on the full amount they had paid for the stocks at issue before the circuit court deducted the amount plaintiffs had received from a settlement. In addition, the trial court's attorney fees award was based on a percentage of the court's incorrect damage calculation. Accordingly, we reverse the trial court's award of damages and attorney fees and remand this matter to the trial court to calculate plaintiffs' section 13(A) damages consistent with this order and to determine a reasonable amount of attorney fees based on the correct amount of damages.

¶ 6                                      I. BACKGROUND

¶ 7    The "case within a case" on which plaintiffs' malpractice claim is predicated was plaintiffs' cause of action against Shearson Lehman Brothers Holdings, Inc. (Shearson), and other individuals and firms (the Shearson defendants) for violations of the Illinois Securities Law. That cause of action arose from plaintiffs' 12 separate purchases of First Capital Holdings (FCH) stock through Shearson broker Michael Steinberg, who was the office manager of Shearson's Peoria, Illinois, office and a close personal friend of the plaintiffs. Plaintiffs' purchases were made between 1987 and 1990 and totaled $4,745,254.45.

¶ 8    In the spring of 1991, FCH filed for bankruptcy, and plaintiffs' FCH stock became worthless. In 1991, plaintiffs retained the defendant law firm BFKP to: identify and evaluate plaintiffs' claims arising from their investments in FCH stock; negotiate a settlement of those claims with the Shearson defendants; and–if no settlement could be effected–preserve plaintiffs' claims until they retained a contingent-fee lawyer to file suit. BFKP did not achieve a settlement of plaintiffs' claims.

¶ 9    When plaintiffs retained BFKP, plaintiffs had a viable claim against the Shearson defendants for rescission under the Illinois Securities Law. The Illinois Securities Law mandates that victims of securities fraud are entitled to recover their entire stock purchase price, plus 10% interest on that purchase from the date of the purchases to the date of judgment, plus their attorney fees, costs and expenses. 815 ILCS 5/13(A) (West 2010). However, in order to bring that Illinois Securities Law claim, the purchaser must serve a notice of rescission within six months of learning of his right to this statutory remedy. 815 ILCS 5/13(B) (West 2010). BFKP, however, never served the rescission notice, never advised plaintiffs to do so, and never sought to toll the time to serve the rescission notice.

¶ 10    In 1992, plaintiffs hired new counsel to prosecute their claims against the Shearson defendants in the underlying case. Although plaintiffs' complaint included the Illinois Securities Law claim, that claim was dismissed by the trial court as time-barred, and that

dismissal was ultimately affirmed on appeal. *Goldfine v. Steinberg*, No. 1-00-1004 (2004) (unpublished order under Supreme Court Rule 23). Meanwhile, in 1994, plaintiffs filed the instant malpractice action against defendants BFKP and its partners to recover the damages plaintiffs would have recovered under the Illinois Securities Law if defendants' negligence had not barred plaintiffs from pursuing their Illinois Securities Law claim. In 1996, while the underlying *Steinberg* case was pending, a stipulated order was entered that delayed the malpractice trial until after the resolution of the *Steinberg* case.

¶ 11    In 1999, the trial court dismissed plaintiffs' remaining claims in the *Steinberg* case, and plaintiffs appealed. In 2004, this court remanded to the trial court two of plaintiffs' claims against the Shearson defendants–common law fraud and violation of the Illinois Consumer Fraud and Deceptive Business Practices Act (Consumer Fraud Act) (815 ILCS 505/1 *et seq*. (West 2004)). In 2007, plaintiffs settled their non-Illinois Securities Law claims in the underlying *Steinberg* case for $3.2 million.

¶ 12    Thereafter, this malpractice case proceeded to a bench trial. The trial court heard both plaintiffs' "case within a case" claim under the Illinois Securities Law and their malpractice claim against BFKP and its partners for failing to preserve the Illinois Securities Law claim in the underlying *Steinberg* case. Over nearly eight weeks, the court heard numerous witnesses, both live and videotaped, and through deposition testimony, and the parties introduced voluminous exhibits.

¶ 13    On July 12, 2010, the trial court ruled that, after the plaintiffs' first purchase of FCH stock, the Shearson defendants violated the Illinois Securities Law concerning plaintiffs' next 11 FCH stock purchases. The trial court accepted and credited Mr. Goldfine's testimony and found that plaintiffs were entitled to relief under Section 13(A) of the Illinois Securities Law. The court also heard extensive testimony from the defendant lawyers who had handled plaintiffs' representation and expert witnesses for both sides. The court found that BFKP had breached its duties to plaintiffs by negligently failing to carry out its assignment to preserve plaintiffs' Illinois Securities Law claim and that the loss of that claim had been caused by BFKP's negligent conduct. The trial court ruled that plaintiffs' damages would be calculated according to the following formula: plaintiffs' $3.2 million settlement would be deducted from the total they had paid for their 11 stock purchases, and then 10% interest would be calculated on the remaining amount based on the various dates of those stock purchases. The court ordered the parties to calculate the exact amount to enter in a judgment order, ordered plaintiffs to prepare the judgment order, and gave plaintiffs leave to file their petition for attorney fees.

¶ 14    Plaintiffs moved the court to modify or clarify its July 2010 order. Plaintiffs argued, *inter alia*, that the trial court's damage calculation formula was erroneous and contrary to precedent as set forth in *Kugler v. Southmark Realty Partners III*, 309 Ill. App. 3d 790 (1999). Thereafter, the parties filed briefs on the damage calculation issue and various motions and responses concerning plaintiffs' petition for attorney fees. On September 22, 2010, after argument was held on plaintiffs' motion to modify the July 2010 order, the trial court denied plaintiffs' motion and ordered them to file their petition for attorney fees and costs. Specifically, the trial court stated that this legal malpractice case was "very unique" and distinguishable from *Kugler*. Moreover, the trial court agreed with the special

-4-

concurrence in *Kugler* and thought it would be a windfall and unfair to defendants to apply the *Kugler* damage calculation formula in the instant case. Accordingly, the trial court adopted defendants' damage calculation and held that the court would wait for plaintiffs' petition for attorney fees and costs before entering judgment.

¶ 15 After argument was held on plaintiffs' petition for attorney fees, costs and expenses, the trial court ruled, on May 17, 2011, that a contingency fee of 40% of the recovered amount was reasonable. The court stated that plaintiffs' counsel would have received a contingency fee pursuant to their retainer agreement and it was difficult to separate the time plaintiffs' counsel had allotted to either the malpractice or Illinois Securities Law claim. The court denied costs and expenses to one of plaintiffs' counsel because the court could not "determine the specific nature of the costs and whether the costs specifically pertained to this case." The court, however, granted in full costs and expenses to the plaintiffs' other counsel.

¶ 16 On May 24, 2011, the trial court entered judgment in this case and adopted the securities purchase price and interest calculation proposed by defendants. Specifically, the trial court took the sum of $4,506,602.05, which represented the total amount of plaintiffs' 11 stock purchases made in 1988, 1989 and 1990, and deducted $3.2 million, which was the amount of the 2007 *Steinberg* settlement. However, because those stocks were purchased on 11 different dates, the trial court applied a "proportionate reduction of $3,200,000.00 (71.00693%)" to each purchase to obtain a "net" purchase price for each of the 11 stock purchases. The total sum of those net purchase prices was $1,306,602.29. Using the net purchase price for each of the 11 purchases and the corresponding date of sale for each purchase, the trial court then calculated a 10% annual interest award, through May 24, 2011, of $2,785,149.91. This resulted in a total section 13(A) award, before attorney fees, costs and expenses, of $4,091,752.19. Furthermore, the trial court awarded plaintiffs attorney fees of 40% on the $4,091,752.19 award, or $1,636,700.80, and $207,167.28 in costs and expenses. Accordingly, the court entered a total award of $5,935,620.10 in favor of plaintiffs and against defendants.

¶ 17 Plaintiffs appealed, contending the trial court failed to calculate their statutory damages according to the mathematical formula in section 13(A) of the Illinois Securities Law. Plaintiffs also argue the trial court erred by failing to award reasonable attorney fees, expenses and costs. Defendants cross-appealed, contending that the award of interest, attorney fees and costs should be reversed because the fee-shifting and interest provisions of section 13(A) are punitive and coercive and, thus, fall within the category of damages that are barred by statute in legal malpractice actions. Defendants also argue that the trial court erred in finding that plaintiffs proved their underlying Illinois Securities Law claim where Mr. Goldfine's reliance on his broker's representations concerning stock purchases was not reasonable, and where plaintiffs failed to prove that any malpractice proximately caused any damage.

¶ 18                                    II. ANALYSIS
¶ 19                        A. Calculation of Section 13(A) Damages
¶ 20 Plaintiffs argue that the trial court misapplied the section 13(A) damage formula when

the court deducted from plaintiffs' stock purchase price the $3.2 million settlement plaintiffs had received in 2007 from the *Steinberg* case before the court calculated the mandatory 10% annual interest. We agree.

¶ 21    "A legal malpractice plaintiff is entitled to recover those sums which would have been recovered if the underlying suit had been successfully prosecuted." *Weisman v. Schiller, Ducanto & Fleck*, 314 Ill. App. 3d 577, 580 (2000). Here, the trial court found that plaintiffs proved their "case within a case," *i.e.*, that they would have prevailed on their Illinois Securities Law claim against the Shearson defendants and were entitled to statutory damages pursuant to section 13(A) based on $4,506,602.05 in FCH stock purchases. Section 13(A) provides, in pertinent part:

> "A. Every sale of a security made in violation of the provisions of this Act shall be voidable at the election of the purchaser ***; and the issuer, controlling person, underwriter, dealer or other person by or on behalf of whom said sale was made, and each underwriter, dealer or salesperson who shall have participated or aided in any way in making the sale, and in case the issuer, controlling person, underwriter or dealer is a corporation or unincorporated association or organization, each of its officers and directors (or persons performing similar functions) who shall have participated or aided in making the sale, shall be jointly and severally liable to the purchaser as follows:

> (1) *for the full amount paid, together with interest from the date of payment for the securities sold* at the rate of the interest or dividend stipulated in the securities sold (or if no rate is stipulated, then *at the rate of 10% per annum) less any income or other amounts received by the purchaser on the securities*, upon offer to tender to the seller or tender into court of the securities sold or, where the securities were not received, of any contract made in respect of the sale; *or*

> (2) *if the purchaser no longer owns the securities, for the amounts set forth in clause (1) of this subsection A less any amounts received by the purchaser for or on account of the disposition of the securities*." (Emphases added.) 815 ILCS 5/13(A) (West 2010).

The issue here is the proper interpretation of the Illinois Securities Law, which is a question of law and, thus, reviewed by this court *de novo. Woods v. Cole*, 181 Ill. 2d 512, 516 (1998).

¶ 22    In construing the statute, the court must look primarily to the words of the statute as evidence of the legislature's intent. *Lemont-Bromberek Combined School District No. 113(a) v. Walter*, 279 Ill. App. 3d 847, 849 (1996). Judicial construction is only necessary when the statute is unclear or ambiguous. *Buckellew v. Board of Education of Georgetown-Ridge Farm Community Unit School District No. 4*, 215 Ill. App. 3d 506, 511 (1991). The court must construe the statute as it is and, regardless of the court's opinion regarding the desirability of the results surrounding the operation of the statute, the court "may not, under the guise of construction, supply omissions, remedy defects, annex new provisions, substitute different provisions, add exceptions, limitations, or conditions, or otherwise change the law so as to depart from the plain meaning of the language employed in the statute." *Id*.

¶ 23    This court previously construed section 13(A) of the Illinois Securities Law in *Kugler*, 309 Ill. App. 3d 790. The trial court in *Kugler* found that the broker defendants were liable

under the Illinois Securities Law to the class of plaintiffs who had purchased securities during the years of 1985 and 1986. *Id*. at 792. On May 11, 1998, the trial court entered judgment for plaintiffs in the amount of $902,759.48, pursuant to section 13(A) of the Illinois Securities Law. *Id*. at 793. On appeal, the defendants challenged the trial court's calculation of damages, contending the trial court had failed to deduct $2,952.05 in accrued interest and $12.50 in sale proceeds from the damages where two class members, who originally paid in excess of $7,000 for the securities, sold them for $12.50 on December 31, 1995. *Id*. at 793, 798.

¶ 24    The majority opinion in *Kugler* found that the clear and unambiguous language of section 13(A) provided that the statutory damages were calculated as the full amount the purchaser had paid for his securities, plus accrued interest from the date of payment of the securities at 10% per annum, less any income or other amounts received upon the disposition of the securities. *Id*. at 797. Although the majority opinion thought "a purchaser who sells his securities should be entitled only to interest up to the date of sale and not beyond," the majority would not "depart from the plain meaning of the statute" and could not "supply omissions, remedy defects, or otherwise change the law." *Id*. at 797-98. See also Ryon M. McCabe, *Statutory Damages Under the Florida Securities and Investor Protection Act: How to Calculate and Apply Rescission Damages*, 83 Fla. B. J. 32, 33-36 (October 2009) (citing *Kugler* and noting that Illinois, like Florida, provides a unique measure of statutory rescission damages and powerful tool for investors that differs from traditional compensatory or out-of-pocket damages); 12A Joseph C. Long, Blue Sky Law § 9:15 n.10 (June 2010) (noting that the statutes in Florida, Illinois and Texas do not require a deduction of interest earned on the proceeds of the sale of the original securities).

¶ 25    The special concurrence in *Kugler* disagreed with the majority's interest calculation, finding it to "constitute a windfall and an effective double recovery to the purchaser." *Kugler*, 309 Ill. App. 3d at 798 (Gordon, J., specially concurring). The special concurrence argued that interest should be charged against the original purchase price up to the time the security is resold. Once the security is resold, interest should be charged up to the date of judgment based on the difference between the original purchase price and the amount recouped on the resale. *Id*. According to the special concurrence, the language of section 13(A)(2) releases the seller of the securities from any obligation to repay the amount the purchaser recovered on any resale and, thus, it "naturally follows that the interest obligation is correspondingly diminished." *Id*. at 799. Nevertheless, the special concurrence thought the amount of money in dispute was *de minimus* and did not warrant a remand or adjustment. *Id*. The calculation formula preferred by the special concurrence seems to be: damages = (original purchase price + statutory interest from purchase to judgment date - any income received on the securities) - (value of securities when resold + statutory interest from resale to judgment date). The special concurrence's formula would supply a mechanism, which is not provided in the clear language of the statute, to reduce a damage award by the amount of interest earned on the proceeds of a resale.

¶ 26    To support the proposition that section 13(A) did not need to be construed to include interest on the proceeds of the resale, the special concurrence relied on a dictionary definition of the word "interest" as a " 'price paid for borrowing money generally expressed as a

percentage of the amount borrowed paid on one year.' " *Id.* (quoting Webster's Third New International Dictionary 1178 (1993)). The special concurrence contended that because a 13(A) damage award is reduced by any money recovered on resale, the amount borrowed or principal for purposes of calculating 13(A) interest must also reflect that reduction. *Id.* The special concurrence's rationale, however, is not persuasive. Section 13(A) does not address situations involving borrowed money but, rather, the sale of securities in violation of securities law. Accordingly, the more apt definition for interest here is "an excess over and above an exact equivalent." Webster's Third New International Dictionary 1178 (1993); see also Black's Law Dictionary 816 (7th ed. 1999) (defining interest as the "compensation fixed by agreement or allowed by law for the use or detention of money, or for the loss of money by one who is entitled to its use").

¶ 27     To the extent that any accrued interest results in a surplus award to a plaintiff, the clear language of the statute indicates that the legislature chose not to permit the liable defendant to reap the benefits of the plaintiff's good fortune in obtaining income on the securities gratuitously or the plaintiff's efforts to minimize the harm done by the defendant. In choosing who should receive any windfall from a surplus interest award, *i.e.*, compensation over and above that necessary to compensate the plaintiff for injuries sustained by the defendant's tortious conduct, the legislature deemed the plaintiff far more deserving than the defendant. The legislature, however, curtailed any double recovery by requiring the amount of any resale or income received on the securities to be deducted from the 13(A) damage award. The legislature could have easily required any surplus interest award to also be offset but chose not to do so. Even if we were so inclined, we are in no position to bring about such a change.

¶ 28     Here, the trial court cited the *Kugler* special concurrence to support the interest calculation used in the instant case. However, the trial court's attempt to apply the formula suggested by the *Kugler* special concurrence, which addressed a situation involving the resale of securities, to the instant situation, which concerns the deduction of a settlement award, reveals the erroneous reasoning underlying the special concurrence's position. When the situation involves a resale of securities, like in *Kugler*, a deduction to the interest calculation based on the difference between the original purchase price and the amount recouped on the resale would remedy fairly easily a perceived statutory defect or omission in the Illinois Securities Law concerning a purported failure to deduct interest on the proceeds of the resale. The instant case, however, establishes that a court, under the guise of statutory construction, must significantly revise the clear statutory language of section 13(A) to effectuate the accrued-interest policy concerns raised by the defendants, trial court and partial dissent here and the *Kugler* special concurrence.

¶ 29     Here, 11 stock purchases were made on 11 different dates during 1988, 1989 and 1990, and the original purchase prices ranged from as low as $13,106.44 on May 20, 1988, to as high as $1,184,940.25 on February 23, 1990. Between 17 and 19 years elapsed from the dates plaintiffs had purchased the stocks to the date they received the $3.2 million settlement from the Shearson defendants in 2007. Over three more years elapsed before plaintiffs received the judgment in this malpractice action against defendants for their negligent failure to preserve plaintiffs' Illinois Securities Law claim against the Shearson defendants. Due to securities violations and legal malpractice, plaintiffs were denied the use of over $4.5 million

for about 20 years. Under these circumstances, why should the 2007 $3.2 million settlement reach back almost 20 years to be deducted from plaintiffs' original purchase price and thereby cut off their entitlement under the statute to accrued interest? Although the trial court thought it would be fair in 2010 to apply the 2007 $3.2 million settlement to each purchase price as a proportionate reduction (see *supra* ¶ 16), there is absolutely no statutory basis for the court to exercise that discretion. Moreover, if the legislature had intended to require a deduction of interest earned on the proceeds of a resale or other recovered amounts, the legislature was surely capable of drafting that requirement into the statute or amending the statute after *Kugler* was issued.

¶ 30    Like the *Kugler* majority, we cannot depart from the plain meaning of the statute, which provides that the 10% interest is calculated on the full amount paid for the securities before deductions are made for any income or amounts received by the purchaser on the securities. Consequently, we find that the trial court erred when it deducted the $3.2 million settlement from the total purchase price before calculating the interest. Accordingly, we reverse the trial court's judgment concerning the damage calculation and remand this matter for an adjustment of plaintiffs' damages in accordance with this order. Here, the full amount of the purchase price on the 11 stock purchases at issue was $4,506,602.05. According to plaintiffs, the correct interest calculation on that amount, which must account for the 11 different dates of purchase of those stocks, at 10% annually from the date of payment for the shares until the July 12, 2010 order by the trial court should have been $9,230,916.38, for a total of $13,737,518.43. Then, the $3.2 million 2007 settlement should have been deducted from $13,737,518.43, for a damage award of $10,537,518.43. Although the trial court used the wrong purchase price and interest calculation, the trial court correctly ruled that the 10% interest calculation had to be updated through the date of the final judgment on May 24, 2011. Because this court has ruled in plaintiffs' favor concerning the interest calculation, the $9,230,916.38 interest calculation must be updated again.

¶ 31    Plaintiffs also argue that the trial court should not have deducted the entire $3.2 million settlement from plaintiffs' damage award because they actually received only $1,657,000 of that settlement where they expended $1,543,000 in costs and attorney fees in order to obtain that settlement. We disagree. In the underlying *Steinberg* case, plaintiffs and the Shearson defendants entered a settlement agreement after plaintiffs' Illinois Securities Law claim was dismissed as time-barred and that dismissal was affirmed on appeal. The release in the *Steinberg* case provided that plaintiffs released any and all claims against the Shearson defendants that related to any of the matters alleged in their underlying lawsuit, or their account with the Shearson defendants, or their investments in the common stock of FCH. However, the release expressly provided that nothing therein affected plaintiffs' right to pursue their legal malpractice claims. Applying the plain language of section 13(A), the $3.2 million plaintiffs received in the settlement of their statutory and common law fraud claims constitutes "other amounts received by the purchaser on the securities." Moreover, section 13(A) makes no provision for stock purchasers like plaintiffs to deduct fees or costs from those "other amounts received."

¶ 32    Defendants argue that this court should reject plaintiffs' challenge to the trial court's calculation of damages because the trial court simply applied the measure of damages in

accordance with the testimony of plaintiffs' securities law expert witness Michael Moirano. Specifically, defendants assert Moirano testified that, under the Illinois Securities Law, the 10% interest is calculated on the purchase price after deductions are made for any dividends or other amounts received. Defendants contend that plaintiffs should not be permitted to abandon their expert's testimony after inducing the trial court to rely on it.

¶ 33    According to the record, plaintiffs' counsel, on redirect examination, questioned Moirano regarding how he would advise a client about pursuing an Illinois Securities Law claim as opposed to a claim for punitive damages or margin interest based on the greater value of the rescission damages available under the Illinois Securities Law. Moirano answered:

"A. If it were in the six-month [Illinois Securities Law] period, I would explain to him that the margin interest, in my opinion, under any circumstance, would be very difficult to get, but under the Illinois statute, because you got ten percent interest from the date of purchase, unless you're paying really ten percent interest on whatever it is you borrowed, you're going to get that–an equivalent amount of money and more by persuing [*sic*] that claim. And it would be the best–the quickest way to go.

Q. Now, you were asked about damages under the Illinois Securities Law. Is that damage analysis strictly mechanical?

A. You mean on a loss causation analysis?

Q. Right.

A. No, absolutely not.

Q. Damages under the Illinois Securities Law?

A. Oh, the Illinois Securities Law. Excuse me, yes. You get your money back. You get how much you paid. So whatever you paid, you get back.

Q. And you get ten percent from the date of purchase to the date of payment, right?

A. Correct."

¶ 34    Thereafter, Moirano testified that the trial court determines the reasonable amount of attorney fees for the prevailing plaintiff under the Illinois Securities Law. He continued:

"A. *** [Y]ou're just going to say, 'Hopefully we'll get all our attorneys' fees back,' or whatever the deal is on the attorneys' fees, so the client is made whole. That's the intent of the statute, make the client whole, plus ten percent interest today.

***

THE COURT: I have a couple of questions. Mr. Moirano, you just were asked about damages under the [Illinois Securities Law]?

A. Yes.

THE COURT: You stated it's mechanical. Doesn't it also state you get the purchase price back of the securities, less any income, or other amounts received by the purchaser on the securities?

A. Yes. So if you got dividends–if you sold some of the shares, you get a net.

THE COURT: Right.

A. You get put back to where you were.

THE COURT: You get back to the beginning, from the front end?

A. Yes.

THE COURT: And then the ten percent kicks in?

A. Yes."

¶ 35    Redirect examination continued, and plaintiffs' counsel questioned Moirano regarding how a reasonable lawyer would advise a client about the expense of pursuing other claims in addition to an Illinois Securities Law claim, and the risk of not pursuing all the claims. Moirano responded:

"A. You know your liability. You should know what the evidence of your liability is. So you can tell the client, 'On the liability side, under the [Illinois Securities Law] claim, we can probably either get a summary judgment or you're going to be–I'm fairly confident that you can prevail on that. Your damages are going to be "X." They're going to get your money back, less whatever you received, times ten percent.' "

¶ 36    Plaintiffs respond that at the bench trial, the formula by which plaintiffs' Illinois Securities Law damages were to be calculated was never an issue because the calculation was purely a matter of law and neither Moirano nor any other expert disclosed or offered Illinois Supreme Court Rule 213 (eff. Jan. 1, 2007) opinions on the subject. Plaintiffs add that the above-quoted exchange shows that the trial court *sua sponte* asked Moirano a question for which he had not prepared and which he answered without having the words of the statute in front of him. Moreover, plaintiffs submitted their motion to modify the trial court's damage calculation as soon as the trial court issued its July 2010 order indicating that it had misapplied the section 13(A) formula, so no party was prejudiced nor was any extra expense incurred.

¶ 37    We agree with plaintiffs that the trial court's question to Moirano was confusingly worded and the meaning of Moirano's testimony in the above-quoted exchange is less than clear. Moirano may well have understood the trial court's question to mean that the 10% interest "kicks in" from "the beginning" or "front end" as required by *Kugler*. In any event, the manner in which the statutory damages must be calculated is purely a question of law, and nothing Moirano said could override the plain language of section 13(A) and this court's explicit holding in *Kugler*.

¶ 38    Next, defendants argue that this court should reject blind adherence to *Kugler* in the very different context of this case because *Kugler*, which addressed an Illinois Securities Law claim, did not address a legal malpractice action or how damages should be assessed against negligent attorneys for the loss of an Illinois Securities Law claim. Defendants' argument lacks merit. Like the Illinois Securities Law, no statute or common law precedent establishing private causes of action contains the superfluous language that the statutory or common law damages in such causes of action also apply in the event the plaintiff's lawyer is sued for malpractice because he negligently caused the action to be time barred. Illinois law is clear that a "legal malpractice plaintiff is entitled to recover those sums which would have been recovered if the underlying suit had been successfully prosecuted." *Weisman*, 314 Ill. App. 3d at 580.

¶ 39    Next, defendants argue that even if *Kugler* does apply here, plaintiffs failed to prove the

-11-

amount of any interest award because they failed to introduce any evidence showing when they reasonably would have obtained recovery against the Shearson defendants, and thereby stopped the running of section 13(A) interest, absent defendants' legal malpractice. Defendants' argument lacks merit. The award of interest under section 13(A) is controlled by the clear, unambiguous language of the statute, and the statute does not require the purchaser of securities to submit the type of proof–which would be purely speculative–urged by defendants.

¶ 40                    B. Award of Section 13(A) Interest, Fees and Costs
                           in a Legal Malpractice Action

¶ 41      Defendants argue that the 10% interest, attorney fees, and costs recoverable under section 13(A) of the Illinois Securities Law constitute punitive damages and, thus, are barred in legal malpractice actions by section 2-1115 of the Code of Civil Procedure (Code) (735 ILCS 5/2-1115 (West 2010)). We review this issue of law *de novo* (*Tri-G, Inc. v. Burke, Bosselman & Weaver*, 222 Ill. 2d 218, 254 (2006)), and conclude that defendants' argument lacks merit.

¶ 42      Section 2-1115 of the Code provides:

"Punitive damages not recoverable in healing art and legal malpractice cases. In all cases, whether in tort, contract or otherwise, in which the plaintiff seeks damages by reason of legal, medical, hospital, or other healing art malpractice, no punitive, exemplary, vindictive or aggravated damages shall be allowed." 735 ILCS 5/2-1115 (West 2010).

Furthermore, a statute is penal if it (1) imposes automatic liability for a violation of its terms; (2) sets forth a predetermined amount of damages; and (3) imposes damages without regard to the actual damages suffered by the plaintiff. *Landis v. Marc Realty, L.L.C.*, 235 Ill. 2d 1, 13 (2009). "By contrast, a statute is remedial where it 'imposes liability only when actual damage results from a violation' and where 'liability is contingent upon damage being proven by the plaintiff.' " *Id*. (quoting *McDonald's Corp. v. Levine*, 108 Ill. App. 3d 732, 738 (1982)).

¶ 43      Defendants argue the section 13(A) fee-shifting and interest provisions are coercive and punitive in nature and fall within the category of damages the legislature has barred in section 2-1115. Defendants contend that they had no ability to rescind plaintiffs' stock purchases to stop the interest and fees from accumulating. Further, defendants contend that assessing millions of dollars in interest, fees, and costs against attorneys would neither punish the actual wrongdoers nor compel compliance with securities laws.

¶ 44      To support the proposition that section 13(A) interest, fees, and costs constitute punitive damages, defendants cite *Foreman v. Holsman*, 10 Ill. 2d 551, 553-54 (1957) ("this civil remedy is intended to afford an additional punishment for an offending party"); *Gowdy v. Richter*, 20 Ill. App. 3d 514, 530 (1974) (the "penal character" of the Illinois Securities Law fee-shifting provision warns violators that they will be responsible for reasonable attorney fees incurred in returning the purchaser to his status quo); *Jacobs v. James*, 215 Ill. App. 3d 499, 505 (1991) ("[t]he goals of the fee-shifting provision of the Securities Law are to (1) penalize defendants for illegal acts, and (2) remove the expense of legal representation as an obstacle to plaintiffs bringing suit"); *Condux v. Neldon*, 83 Ill. App. 3d 575, 577 (1980) (the

Illinois Securities Law rescission provision "is a penalty, designed to compel promoters to register their stock"); and *Bain v. Financial Security Life Insurance Co.*, 53 Ill. App. 3d 702, 708 (1977) ("securities laws *** provide both criminal and civil penalties for violations thereof" and "provide for sanctions against those violating such laws").

¶ 45      The cases cited by defendants do not support the contention that section 13(A) interest, fees and costs constitute punitive damages. Although statements were made by the court in those cases about sanctions or penalties under the securities laws, defendants take those statements out of context, and none of those cases held that section 13(A) interest, attorney fees and costs constituted punitive damages.

¶ 46      We find that the 10% interest, attorney fees and costs awarded under section 13(A) of the Illinois Securities Law do not constitute barred punitive damages under section 2-1115 of the Code. Section 13(A) interest, fees and costs are not imposed as a predetermined amount without regard to the actual damages suffered by the plaintiff. Rather, 13(A) interest, fees and costs are all components of the remedial damages that are mandated by statute to compensate the plaintiff who has proven that actual damage resulted from the defendant's violation of the Illinois Securities Law. See *Standard Mutual Insurance Co. v. Lay*, 2013 IL 114617, ¶¶ 31-33 (the statutory damages of $500 per violation under the Telephone Consumer Protection Act of 1991 (47 U.S.C. § 227(b)(3) (2006)) were not punitive damages but, rather, compensated consumers for a harm suffered and provided an incentive for private parties to enforce the statute). Moreover, there is no provision in the Illinois Securities Law for the recovery of punitive damages. See *Peterson v. Baloun*, 715 F. Supp. 212, 216 (N.D. Ill. 1989) (the court struck a punitive damage claim under the Illinois Securities Law because it does not provide a remedy of punitive damages); *Anvil Investment Limited Partnership v. Thornhill Condominiums, Ltd.*, 85 Ill. App. 3d 1108, 1119 (1980) (a punitive damage award for willful acts of abuse was a court-created remedy and was separate from and in addition to the 10% interest and attorney fees mandated by section 13(A) of the Illinois Securities Law).

¶ 47      Defendants also cite *Tri-G, Inc.*, 222 Ill. 2d 218, to support the proposition that section 13(A) interest, attorney fees and costs cannot be imposed on negligent lawyers, but defendants' reliance on that case is misplaced. Tri-G, the plaintiff client, sued a law firm for failing to prosecute Tri-G's previously filed complaint against a bank. *Id*. at 225. Tri-G's "case within a case" against the bank involved certain construction loans the bank had made to Tri-G, and Tri-G alleged breach of contract, common law fraud, and violation of the Consumer Fraud Act against the bank. *Id*. at 226. Tri-G's complaint against the bank was dismissed with prejudice after Tri-G's counsel was not prepared to proceed when the case was called for trial. *Id*. at 227. Tri-G then sued its counsel for negligence, and a trial on the merits was held. The jury found that, but for counsel's negligent handling of Tri-G's case against the bank, Tri-G would have recovered $1,168,775 in compensatory damages and an equal sum in punitive damages from the bank. *Id*. at 225. Accordingly, the circuit court entered judgment on the jury's verdict in favor of Tri-G and against the law firm for $2,337,550. *Id*.

¶ 48      On appeal, a majority of our supreme court held, *inter alia*, that lost punitive damages were not recoverable in a subsequent legal malpractice action. *Id*. at 267. The majority stated

that the jury had already awarded full compensation to Tri-G for all the damages it actually sustained and an award of punitive damages against the law firm would not advance the policy behind the concept of punitive damages to punish the willful and wanton misconduct of offenders like the bank and deter them from committing similar acts of wrongdoing in the future. *Id*. The majority concluded that because section 2-1115 of the Code decrees that lawyers cannot be compelled to pay punitive damages based on their own misconduct, "it would be completely nonsensical to hold that they can nevertheless be compelled to pay punitive damages attributable to the misconduct of others." *Id*. at 267-68. The dissent viewed Tri-G's lost punitive damages in the underlying case as an element of compensatory damages in the malpractice action and argued that such compensatory damages were not prohibited by section 2-1115. *Id*. at 269-70 (Freeman, J., concurring in part and dissenting in part, joined by McMorrow and Fitzgerald, JJ.).

¶ 49    The holding in *Tri-G* concerning lost punitive damages is not applicable in the instant case. In *Tri-G*, the court reversed only the portion of the jury award for the lost punitive damages Tri-G would have recovered against the bank in the underlying case. In doing so, the court noted that the jury had already fully compensated Tri-G for all the damages it actually had sustained. Here, in contrast, plaintiffs' legal malpractice award against defendants is remedial statutory compensation for plaintiffs' lost Illinois Securities Law claim. Absent the section 13(A) interest, attorney fees and costs, plaintiffs would not be fully compensated for all their damages under the Illinois Securities Law. Moreover, unlike punitive damages, section 13(A) relief is calculated by the court according to an objective, precise mathematical formula. The 10% interest, attorney fees and costs are all components of the statutorily mandated relief to which plaintiffs would have been entitled under the Illinois Securities Law if defendants' negligence had not caused their claim to have been time barred. Consequently, the uncertainties and difficulties of proof that apply to true punitive damage awards do not apply to section 13(A) damage awards. The section 13(A) relief can in no way be deemed punitive damages as barred by *Tri-G* and section 2-1115 of the Code.

¶ 50    Similarly, defendants' reliance on *Tri-G*'s holding rejecting Tri-G's claims for prejudgment interest is also misplaced. Specifically, Tri-G sought damages equal to the amount of postjudgment interest on the hypothetical judgment Tri-G would have received against the bank in the underlying case but for the law firm's negligence. *Id*. at 256. The court rejected this claim because the:

" 'recovery of interest in this State, not contracted for, finds its only authority in the statute. It is purely statutory.' " *Id*. (quoting *Blakeslee's Storage Warehouses, Inc. v. City of Chicago*, 369 Ill. 480, 483 (1938)).

Unlike the situation in *Tri-G*, here, section 13(A) explicitly requires that a stock purchaser entitled to rescission is also entitled to recover 10% interest on the purchase price from the date of the purchase. That 10% interest is a component of the statutorily mandated remedial relief to which plaintiffs would have been entitled under the Illinois Securities Law if defendants' negligence had not caused plaintiffs' Illinois Securities Law claim to be time barred.

¶ 51                                  C. Attorney Fees, Costs and Expenses

¶ 52        The Illinois Securities Law provides, "[i]f the purchaser shall prevail in any action brought to enforce any of the remedies provided in this subsection, the court shall assess costs together with reasonable fees and expenses of the purchaser's attorney against the defendant." 815 ILCS 5/13(A) (West 2010). Plaintiffs asked the trial court to award them $5,272,282.60 in attorney fees, and $556,811.64 in costs and expenses for proving their Illinois Securities Law "case within a case"; they did not ask for any fees, costs and expenses incurred in proving the malpractice portion of their case. The trial court, however, awarded plaintiffs $1,636,700.80 in attorney fees and $207,167.28 in costs and expenses. On appeal, plaintiffs argue that the award of fees, costs, and expenses was not reasonable.

¶ 53        "The touchstone in an award of attorney fees is reasonableness ***." *Jacobs*, 215 Ill. App. 3d at 506. In determining the reasonable value of attorney fees, the court should consider the skill and standing of the attorney; the nature of the cause and the novelty and difficulty of the questions at issue; the amount and importance of the subject matter; the degree of responsibility involved in management of the cause; the time and labor required; the usual customary charges in the community; the benefits resulting to the client; and the reasonable connection between the fees sought and the amount involved in the litigation. *Id*. at 505; *J.B. Esker & Sons, Inc. v. Cle-Pa's Partnership*, 325 Ill. App. 3d 276, 283 (2001). The party seeking such fees should provide documentation in a form sufficient in detail to help the court in assessing reasonableness. *McNiff v. Mazda Motor of America, Inc.*, 384 Ill. App. 3d 401, 404 (2008). Sufficient detail includes detailed time records and descriptions of the work performed. *Losurdo Brothers v. Arkin Distribution Co.*, 125 Ill. App. 3d 267, 275 (1984). This court reviews a circuit court's award of attorney fees and costs for an abuse of discretion. *Sampson v. Miglin*, 279 Ill. App. 3d 270, 281 (1996).

¶ 54        The trial court awarded plaintiffs $1,636,700.80 in attorney fees, which was calculated by applying a 40% contingent fee to an Illinois Securities Law damage award of $4,091,752.19. On appeal, plaintiffs do not contest the application of the 40% contingent fee so long as it is applied to a statutorily correct calculation of plaintiffs' Illinois Securities Law damages. Although we agree with plaintiffs that the trial court used an incorrect damage calculation formula (see *supra* ¶¶ 26-30), and we have remanded this cause for the trial court to correct that calculation, we will not hold that plaintiffs are automatically entitled to an attorney fee of 40% of the recalculated damage award.

¶ 55        Contingency fee agreements can be a relevant factor in determining the reasonableness of attorney fees. *McNiff*, 384 Ill. App. 3d at 406. Trial courts, however, may base fee awards on either the lodestar analysis or percentage method. See *Ryan v. City of Chicago*, 274 Ill. App. 3d 913, 924 (1995). A percentage method may be appropriate where the litigation lasted for many years and the allocation of myriad time entries to specific matters or issues is very difficult. *Id*. Alternatively, a lodestar approach shifts the emphasis from a fair percentage of recovery to the value of the time expended by counsel. *Id*. at 922.

¶ 56        Here, the trial court based the fee award "upon the issues raised on the billing statements, the necessity of the work and the possible overlapping of hours spent in other causes of action." Moreover, the trial court noted that it was difficult, in reviewing the attorneys' time

sheets, "to separate the time allotted to the malpractice claim and the [Illinois Securities Law] claim." We will not assume that the trial court, which considered the connection between the fees sought and the amount of the award, would have awarded plaintiffs a 40% contingent fee of a much larger Illinois Securities Law damage award based on plaintiffs' purchase price, plus 10% interest, less the $3.2 million settlement. Accordingly, we reverse the $1,636,700.80 attorney fee award and remand this matter to the trial court to determine reasonable attorney fees based on the correct amount of plaintiffs' Illinois Securities Law damages.

¶ 57    Finally, plaintiffs argue that the trial court abused its discretion by rejecting the entirety of plaintiffs' submission of approximately $350,000 of costs incurred by the Plotkin law firm between 1992 and 2000. According to the record, the trial court awarded $207,167.28 for costs incurred by the Law Offices of Edward T. Joyce & Associates, P.C., in connection with the prosecution of the Illinois Securities Law portion of the legal malpractice litigation from June 2008 through July 2010. The trial court stated that it could "understand both by the affidavit and the description of the charges that each charge is either a 'cost' or an 'expense' under the statute." The trial court, however, denied the costs and expenses submitted by the Plotkin law firm because it was "impossible for [the court] to determine the specific nature of the costs and whether the costs specifically pertained to this case." We find no abuse of discretion by the trial court, which was careful to limit the award to the costs and expenses that pertained only to the underlying Illinois Securities Law claim within the malpractice case, and not the non-Illinois Securities Law claims against the Shearson defendants in the *Steinberg* case.

¶ 58        D. The Illinois Securities Law Claim and Reasonable Reliance

¶ 59    Defendants argue that plaintiffs failed to prove their underlying Illinois Securities Law claim because Mr. Goldfine's reliance on his broker's representations concerning the stock purchases was not reasonable.

¶ 60    A dispute concerning the issue of whether a plaintiff's reliance was reasonable presents a question of fact. See *Central States Joint Board v. Continental Assurance Co.*, 117 Ill. App. 3d 600, 607 (1983). A court of review will reverse the judgment of a trial court, which was in a superior position to evaluate the credibility of the witnesses and the weight of their testimony, only where the findings are against the manifest weight of the evidence. *Id.* at 604. After reviewing the record in this case and the applicable law, we conclude that the trial court's findings were not against the manifest weight of the evidence.

¶ 61    Defendants contend the trial court failed to evaluate each of plaintiffs' purchases separately. According to defendants, such an evaluation would have shown that plaintiffs' loss resulted from Mr. Goldfine's unreasonably risky decisions to purchase $2.1 million of FCH stock in February and August of 1990 without seeking any additional information on FCH or learning anything about FCH's business or the insurance industry, and despite the substantial public information about FCH's large junk bond holdings, precarious financial condition, and negative net worth at that time.

¶ 62    Specifically, defendants argue that by 1990, Mr. Goldfine had access to abundant public

-16-

information about problems at FCH, including a March 12, 1990 Wall Street Journal article reporting that FCH's bond portfolio was $400 million "underwater." Defendants argue that Mr. Goldfine was a sophisticated investor who had lost money in junk bond investments before, and a "person may not enter into a transaction with his eyes closed to available information and then charge that he has been deceived by another." *Id*. at 606. Defendants state that the nondiscretionary account Mr. Goldfine had with Shearson meant that Shearson broker Steinberg did not have a fiduciary relationship with Mr. Goldfine. Defendants add that plaintiffs' friendship with Steinberg did not make Mr. Goldfine's reliance on Steinberg's representations reasonable.

¶ 63     According to the record, plaintiffs' evidence showed that they had been personal friends with Steinberg and his family for more than 25 years. Over the years, they had attended many social and religious functions together, including the confirmations or weddings of their children. Mr. Goldfine was a workers' compensation attorney, and he never practiced securities law. Due to their long-standing relationship and Steinberg's prominent position with Shearson, plaintiffs placed great trust and confidence in his securities recommendations. Mr. Goldfine never purchased a security Steinberg did not recommend or endorse. Steinberg purchased FCH for himself in July 1987. When Goldfine, in October 1987, asked Steinberg to recommend a high quality stock, Steinberg recommended FCH and said he knew all about the company, which had tremendous growth potential. Steinberg also said that Shearson was interested in FCH, had authorized its brokers to sell FCH products, and Shearson would not have allowed its brokers to sell FCH policies and annuities without checking FCH out thoroughly. Steinberg did not mention, and Mr. Goldfine was unaware of, a negative June 1987 Barron's article about FCH. As a result of Steinberg's recommendation, Mr. Goldfine made his first purchase of FCH stock. Thereafter, Mr. Goldfine received FCH's 1987 annual report, which touted FCH's remarkable growth, and Steinberg discussed the report with Mr. Goldfine and told him the report was terrific.

¶ 64     In 1987, E.F. Hutton had sold Hutton Life, an insurance subsidiary, to FCH and had entered into an agreement that required Hutton's stockbrokers and insurance sales personnel to continue selling Hutton Life products to its clients. In November 1987, Hutton expressed an interest in being acquired by Shearson, so Shearson sent a team of employees and attorneys to conduct a comprehensive due diligence examination of Hutton. Shearson also sent Sam Weinhoff, its senior executive and a managing director with insurance expertise, to examine Hutton's insurance investments and to determine the degree of risk in FCH's investment portfolios. Weinhoff found that Hutton owned $30 million of FCH's preferred stock, but it was worth only 50% of its carrying value. This raised solvency questions. In addition, Weinhoff found that FCH was insolvent, with a negative tangible economic net worth of $97.3 million.

¶ 65     In December 1987, Shearson received from Perry Burns, its executive vice president, another report that looked at 43 contemporaneous FCH bond purchases, described the great danger associated with the FCH investment portfolio, called FCH's bond portfolio "scary!" and identified problems that might arise after Shearson owned Hutton. Further, in a December 1987 memo, Weinhoff informed Shearson that FCH had a negative tangible net worth of $227.3 million. Thereafter, a memo from Burns indicated that FCH's bond

portfolios were difficult to analyze because FCH's records were "shoddy and inaccurate."

¶ 66 Shearson acquired Hutton in January 1988 for $800 million to $900 million and thereby inherited the agreement obligating Shearson to sell to its clients the products of FCH's insurance subsidiaries. Shearson considered disavowing that agreement, but FCH threatened to sue, so Shearson permitted the Hutton brokers to continue selling and Shearson brokers to start selling FCH's insurance products and annuities. Shearson brokers like Steinberg viewed this as an endorsement of FCH.

¶ 67 From late 1987 through FCH's demise in May 1991, Shearson knew about FCH's disastrous financial condition but concealed that information from its own brokers, like Steinberg. Shearson steadily, continuously and vigorously told its own brokers that FCH was financially solid and there were no risks. If the truth about FCH had been revealed, customers would have redeemed their FCH insurance products for cash and there would have been a classic "run on the bank." Then FCH, which did not have the money to redeem those products, would have collapsed, and Shearson's existence would have been threatened. Consequently, in May 1988, Shearson decided to purchase control of FCH to avert its bankruptcy and a "run on the bank." Shearson knew and intended that its acquisition of FCH would convey the false impression to Shearson's brokers, life specialists, FCH shareholders and others that Shearson, after due diligence, had concluded that FCH was a financially sound company and a good investment.

¶ 68 Steinberg read the May 4, 1988 press releases to Mr. Goldfine, emphasized Shearson's endorsement of FCH based on Shearson's actions, and stated that the price of FCH represented a bargain. As a result, on May 11, 1988, plaintiffs purchased additional shares of FCH stock. Over the next few weeks, Steinberg continued to recommend FCH to Mr. Goldfine and informed him that former Hutton brokers had discussed FCH's products and profitability with Steinberg. As a result, plaintiffs bought additional FCH shares again in May 1988.

¶ 69 In August 1988, Shearson and FCH concluded the acquisition agreement announced in May, and press releases touted the benefits of combining FCH's product innovation with Shearson's distribution network and financial strength. Steinberg conveyed that information to Mr. Goldfine. In November 1988, Shearson had purchased 44% of FCH's stock and appointed four directors to FCH's new six-member board. Thereafter, Shearson, through presentations, meetings, press releases and other documents, touted its relationship with FCH and encouraged its brokers and life specialists to sell FCH's insurance products and not redeem existing products. The 1988 annual report of FCH reported record-setting growth and reinforced the image that FCH was a safer, more secure company. Shearson, however, knew in late December 1989 that FCH's month-end portfolio showed that its high-yield bonds were $181.4 million underwater.

¶ 70 Steinberg attended regular meetings with other Shearson branch managers and senior executives and received glowing reports about FCH. When Steinberg returned from a New York meeting in late 1989, he was "pumped up" and told Mr. Goldfine about his discussions with the Shearson executives running FCH and its profitability. Based on Steinberg's recommendation, plaintiffs bought more FCH shares in December 1989. In mid-January

1990, Shearson, through Steinberg, recommended that Mr. Goldfine buy more FCH stock and represented that FCH would have record sales and earnings. Steinberg touted FCH's book value and stated that American Express Company would buy FCH because it was making so much money. Relying on that information, plaintiffs bought additional FCH stock in January 1990.

¶ 71    On January 22, 1990, the stock of First Executive Life Insurance Company (First Executive), a large and well known company, dropped significantly. FCH's stock dropped at the same time, and the New York Stock Exchange asked FCH to comment about the price of its stock. In a press release, FCH attributed the current weakness only to announcements by other financial institutions concerning their portfolios. FCH falsely touted its own credit analysis of its bonds and falsely claimed that its high-yield performance was better than the general market. FCH described its investment philosophy in reassuring terms and stated that it soon expected explosive record earnings. Steinberg read the press release to Mr. Goldfine and explained that FCH's stock price had dropped because the market had confused FCH with First Executive, which had a horrendous bond portfolio and a huge mortgage portfolio with significant defaults. Steinberg said that FCH's stock was a bargain. Based on that information and Steinberg's recommendation, plaintiffs bought additional shares of FCH stock.

¶ 72    The negative news articles about First Executive's junk bond portfolio drew attention to FCH's junk bond portfolio, and Shearson financial consultants were starting to ask questions about FCH's financial position and portfolio composition. Shearson sought to remove any anxiety among the financial consultants, noting that business was down in the aftermath of the First Executive news and redemptions were starting to increase. Consequently, Shearson executives reinforced the message that FCH was not like First Executive and was not experiencing similar problems. Shearson concealed from Steinberg and other sales personnel the negative and worsening information about FCH and the continuing deterioration in the quality of its bond portfolio.

¶ 73    In February 1990, Steinberg read to Mr. Goldfine a press release announcing FCH's record net income for 1989 and explained that FCH's low stock price reflected the market's continued confusion of FCH with First Executive. Steinberg recommended that Mr. Goldfine purchase more FCH shares, explaining that Shearson executives had told Steinberg that FCH was in terrific shape and was being marketed as an American Express Company. Steinberg told Goldfine that Shearson's brokers had sold about $3 billion in FCH annuities and Steinberg believed nothing could happen to FCH because the brokers would leave Shearson if it did. Based on that information and Steinberg's recommendations, plaintiffs bought more FCH shares. Steinberg did not know that Shearson had determined that the portfolios of FCH's insurance subsidiaries were more than $320 million underwater as of January 31, 1990.

¶ 74    In August 1990, the stock market generally plummeted, but FCH's press release indicated that its revenue and book value had increased although its earnings had gone down somewhat. Steinberg and Mr. Goldfine viewed the market drop as a buying opportunity. Based on Steinberg's representations that FCH was a Shearson/American Express Company and the purchase of FCH stock was a bargain, plaintiffs bought additional FCH stock.

Steinberg even bought additional stock for himself in October 1990. Shearson continued to respond to negative news by playing up the relationship between FCH and Shearson/American Express Company to its sales personnel and emphasized that there was nothing wrong with FCH. FCH's 1990 annual report, which plaintiffs received in April 1991, concealed its problems from the shareholders and depicted FCH very positively, showing shareholders' equity approaching $400 million. Mr. Goldfine, still believing everything was fine at FCH, wrote FCH on April 26, 1991, and expressed his displeasure about not receiving any response about becoming an FCH board member.

¶ 75     When a state insurance commissioner asked American Express Company to contribute $50 million to bolster FCH's capital position, American Express Company declined. FCH's bank lenders filed an involuntary bankruptcy petition on May 10, 1991. On May 16, 1991, Mr. Goldfine wrote a letter to Steinberg threatening litigation and stating that he wanted the return of the money he had paid for FCH stock.

¶ 76     Based upon the evidence presented at trial, we cannot conclude that the trial court's determination–that Mr. Goldfine reasonably relied on Steinberg's recommendations to buy FCH stock–was against the manifest weight of the evidence. A judgment is not against the manifest weight of the evidence unless the opposite conclusion is clearly evident. *Snelson v. Kamm*, 204 Ill. 2d 1, 35 (2003). Plaintiffs' evidence showed that, from Mr. Goldfine's FCH stock purchases in 1988 through 1990, Shearson continued to conceal material information about FCH's poor financial condition and disseminated very positive but false information about FCH whenever any negative information about FCH appeared in the media. Plaintiffs' expert James Feltman of Mesirow Financial Consulting testified that Shearson and its operating officers had knowledge of the significant and material differences between the information they publicly disclosed about FCH and their actual knowledge of FCH's financial condition. Feltman explained that no publicly available documents would have permitted an individual shareholder to conclude that FCH was insolvent prior to May 1991. Even people who were closely involved with FCH, securities and insurance–and were far more sophisticated investors than Mr. Goldfine–had accepted and relied on the misinformation disseminated by Shearson. Specifically, plaintiffs presented the testimony of a Shearson stockbroker, a Shearson life specialist, and a managing general agent and sales producer for FCH's insurance products.

¶ 77     Contrary to defendants' assertions on appeal, the trial court did not conclude that Mr. Goldfine's reliance on the information he received from Steinberg was reasonable simply due to their friendship. Mr. Goldfine purchased only stock that Steinberg recommended or endorsed, and Steinberg had a long and proven track record of providing plaintiffs with reliable and sound trading advice. Although their relationship played a role in Mr. Goldfine's confidence in Steinberg's recommendations, Mr. Goldfine knew that Steinberg had purchased FCH stock for himself and was receiving positive reports about FCH's condition directly from the Shearson executives who were on the board of FCH and running it.

¶ 78     In addition, plaintiffs presented extensive evidence that Shearson countered any negative information that surfaced concerning FCH's financial condition by withholding material information from its brokers and investors, providing glowing reports about FCH, and taking actions that indicated Shearson had confidence in FCH. That pattern of concealment and

dissemination of half-truths continued over a three-year period and included the time of plaintiffs' last FCH stock purchases in February and August of 1990. Shearson's concealment and misrepresentations had convinced even Steinberg that FCH stock was a good investment, and he bought FCH stock for himself as late as October 1990. The numerous communications between Steinberg and Mr. Goldfine in the context of the information Shearson disseminated and the information it concealed support the trial court's determination that Mr. Goldfine's reliance on Steinberg's recommendations to purchase FCH stock in 1988, 1989 and 1990 was reasonable.

¶ 79      Moreover, the trial court stated that it "thoroughly considered all of the evidence" presented at trial, and the record shows that the trial court received evidence relating to each individual stock purchase before the court concluded that, although plaintiffs did not meet their burden of proof concerning their first 1987 FCH stock purchase, they did prove their Illinois Securities Law claim concerning their 11 subsequent FCH stock purchases in 1988, 1989 and 1990.

¶ 80                        E. Legal Malpractice and Proximate Cause

¶ 81      Defendants argue plaintiffs failed to prove that defendants' legal malpractice proximately caused plaintiffs' loss. Specifically, defendants argue plaintiffs failed to present any evidence showing that, absent defendants' malpractice, plaintiffs, if they still had their Illinois Securities Law claim, would have either received a larger settlement or foregone settlement, tried their case and won greater damages. Defendants contend plaintiffs were required to establish that they would have risked all their non-Illinois Securities Law claims valued at $16 million to $19 million and rejected the $3.2 million settlement for a trial on the Illinois Securities Law issues in the *Steinberg* case. Defendants complain that Mr. Goldfine never testified that, with a viable Illinois Securities Law claim, he would have rejected the $3.2 million settlement and risked going to trial.

¶ 82      "To prevail on a legal malpractice claim, the plaintiff client must plead and prove that the defendant attorneys owed the client a duty of due care arising from the attorney-client relationship, that the defendants breached that duty, and that as a proximate result, the client suffered injury." *Tri-G, Inc.*, 222 Ill. 2d at 225-26. The injury in a legal malpractice action is a pecuniary injury to an intangible property interest caused by the lawyer's negligent act or omission. *Id*. at 226.

> "Where the alleged legal malpractice involves litigation, no actionable claim exists unless the attorney's negligence resulted in the loss of an underlying cause of action. If the underlying action never reached trial because of the attorney's negligence, the plaintiff is required to prove that but for the attorney's negligence, the plaintiff would have been successful in that underlying action." *Id*.

A settlement by successor counsel does not necessarily bar a malpractice action against prior counsel. *McCarthy v. Pedersen & Houpt*, 250 Ill. App. 3d 166, 172 (1993). An attorney malpractice action should be allowed where the plaintiff can show that he settled for a lesser amount than he could reasonably expect absent the malpractice. *Webb v. Damisch*, 362 Ill. App. 3d 1032, 1042 (2005). See also *Brooks v. Brennan*, 255 Ill. App. 3d 260, 268 (1994)

(summary judgment awarded to the defendant where the plaintiff failed to show that she either would have settled the case for a greater amount or received greater damages from a judge or jury). Proximate causation in a legal malpractice case is generally a factual issue to be decided by the trier of fact. *First National Bank of LaGrange v. Lowrey*, 375 Ill. App. 3d 181, 202 (2007) (noting that issues that could cause reasonable persons to reach different results should never be determined as questions of law).

¶ 83    Plaintiffs respond that there is no evidence in the record to support defendants' assumption that the non-Illinois Securities Law claims were worth $16 million to $19 million. According to the record, plaintiffs' expert Moirano testified that the Illinois Securities Law claim had greater, not lesser, value than plaintiffs' non-Illinois Securities Law claims because the Illinois Securities Law claim did not require proof of either loss causation or the defendants' intent to mislead and the statutory damages under section 13(A) mandated the return of the purchase price, plus 10% interest and attorney fees, costs and expenses. The record also refutes defendants' assertion that plaintiffs sought only the loss of settlement value. According to the record, plaintiffs clearly alleged in their fifth amended complaint three distinct and alternative elements of loss–their lost Illinois Securities Law claim, the severely reduced settlement value of the *Steinberg* case, and additional monetary damages. Moreover, that complaint expressly stated that plaintiffs sought to recover the entire value of the damages they would have recovered by winning their Illinois Securities Law claim. Plaintiffs did not try their case on the theory that they would have achieved a higher settlement in the *Steinberg* case if their Illinois Securities Law claim had not been barred.

¶ 84    We find that plaintiffs proved defendants' negligence proximately caused plaintiffs' damages. Plaintiffs did file their Illinois Securities Law claim, and it was dismissed as time barred because no timely six-month rescission notice had been served. Plaintiffs appealed that dismissal, but the dismissal was affirmed by this court. A legal malpractice plaintiff must "recreate and litigate the action which was never filed" (*Nika v. Danz*, 199 Ill. App. 3d 296, 308 (1990)), and plaintiffs met that requirement. Plaintiffs also established that the damages they were entitled to receive under the Illinois Securities Law were greater than the $3.2 million settlement they received in 2007 when they settled the non-Illinois Securities Law claims against the Shearson defendants.

¶ 85    Defendants also argue that plaintiffs' release of the Shearson defendants bars plaintiffs' further recovery here. According to defendants, the $3.2 million *Steinberg* settlement constituted full and complete satisfaction of all injuries plaintiffs sustained by investing in FCH stock, and they may not receive two recoveries. We disagree. A release will not be construed to include claims not within the contemplation of the parties. *Thornwood, Inc. v. Jenner & Block*, 344 Ill. App. 3d 15, 21 (2003). As discussed above (*supra* ¶ 31), the release here expressly provided that it did not affect plaintiffs' legal malpractice claim. Moreover, when the parties entered that settlement agreement in 2007, plaintiffs' Illinois Securities Law claim had already been dismissed as time barred and that dismissal had been affirmed on appeal. In addition, there is no double recovery here because the $3.2 million settlement is deducted from plaintiffs' section 13(A) damages.

¶ 86    Finally, defendants argue that plaintiffs proximately caused their losses by failing, after defendants stopped representing them, to plead the Illinois Securities Law's six-month notice

-22-

requirement with sufficient particularity to withstand the Shearson defendants' motion to dismiss. According to defendants, plaintiffs could have preserved their Illinois Securities Law claim by alleging in the *Steinberg* case that they did not learn they had an Illinois Securities Law claim until they retained their successor counsel in October 1992 and the Illinois Securities Law's rescission notice was served within six months of that date.

¶ 87    Defendants' argument lacks merit. On May 16, 1991, Mr. Goldfine wrote Shearson and demanded a return of the complete purchase price for all of his FCH stock. That letter indicated that Mr. Goldfine was aware of his right to rescission, but defendants, who were retained by plaintiffs in 1991, never served the rescission notice within the six-month period. Plaintiffs retained successor counsel on October 31, 1992, and Mr. Goldfine told successor counsel that he had never heard of an Illinois Securities Law claim. In 1993, successor counsel pleaded that the six-month notice period did not start to run until October 1992, when plaintiffs learned of their Illinois Securities Law claim from successor counsel. However, the Shearson defendants submitted the May 16, 1991 letter to the trial court in the *Steinberg* case, and, on the basis of that letter, plaintiffs' Illinois Securities Law claim was dismissed as untimely.

¶ 88    Furthermore, according to the testimony of defendant Ray Rezner, plaintiffs' former counsel, when Rezner met with Mr. Goldfine on August 9, 1991, Rezner informed him that he had a claim under the Illinois Securities Law but advised him not to pursue it or serve the required notice of rescission. Rezner also testified that he met with plaintiffs' successor counsel in October 1994 and told them he had advised plaintiffs in August 1991 of their Illinois Securities Law claim but urged them not to file the rescission notice.

¶ 89    Based on defendant Rezner's sworn testimony that he advised plaintiffs no later than August 9, 1991 of their rights under the Illinois Securities Law, plaintiffs' Illinois Securities Law claim was barred before they retained their successor counsel. The record establishes that successor counsel could not have filed any meritorious pleading that would have prevented the dismissal of plaintiffs' Illinois Securities Law claim for failure to serve a timely six-month notice.

¶ 90                               III. CONCLUSION

¶ 91    Plaintiffs have made a request to this court for the award of additional attorney fees and costs incident to defending this appeal as authorized by section 13(A) of the Illinois Securities Law (815 ILCS 5/13(A) (West 2010)). We believe plaintiffs are entitled to such fees and costs and the amounts thereof should be determined by the trial court upon petition and hearing. *Yohnka v. Darling Nells, Inc.*, 136 Ill. App. 3d 309, 313 (1985).

¶ 92    For the foregoing reasons, we affirm the circuit court's findings that plaintiffs proved their underlying Illinois Securities Law claim and legal malpractice action. We also affirm the circuit court's award of plaintiffs' costs and expenses. However, we find that the circuit court failed to apply the correct mathematical formula to calculate plaintiffs' mandatory statutory award for damages under the Illinois Securities Law. In addition, the circuit court's attorney fees award was based on a percentage of that incorrect damage calculation. Accordingly, we reverse the circuit court's award of damages and attorney fees and remand

this matter to the circuit court to calculate plaintiffs' statutory damages consistent with this order, to determine a reasonable amount of attorney fees based on the correct damages, and to award attorney fees and costs incident to the appeal.

¶ 93    Affirmed in part and reversed in part; cause remanded with directions.

¶ 94    JUSTICE GORDON, concurring in part and dissenting in part.

¶ 95    I agree to the disposition of this case except as to the majority's calculation of interest, to which I respectfully dissent because the plain and clear language of section 13(A) of the Illinois Securities Law of 1953 (the Illinois Securities Law) does not allow interest charged against that part of a principal the plaintiff has already recovered on. 815 ILCS 5/13(A) (West 2010). Section 13(A) states that every sale of securities in violation of the Illinois Securities Law shall be voidable at the election of the purchaser, and the sellers as well as those who have aided the illegal sale of securities shall be held jointly and severally liable to the purchaser

> "(1) for the full amount paid, together with interest from the date of payment for the securities sold at the rate of the interest or dividend stipulated in the securities sold *** less any income or other amounts received by the purchaser on the securities, upon offer to tender to the seller or tender into court of the securities sold or, where the securities were not received, of any contract made in respect of the sale; or

> (2) if the purchaser no longer owns the securities, for the amounts set forth in clause (1) of this subsection A less any amounts received by the purchaser for or on account of the disposition of the securities." 815 ILCS 5/13(A) (West 2010).

The plain and clear language of section 13(A) only entitles the plaintiff to interest charged against the principal balance that remains after credits are given for payments made.

¶ 96    Since the majority has extensively related the facts, I will repeat here only those facts from which our disagreement arises. Between 1987 and 1990, plaintiffs Morton and Adrienne Goldfine made 12 separate purchases of First Capital Holdings (FCH) stock through a broker at Shearson Lehman Brothers Holdings, Inc. (Shearson). The purchases totaled $4,745,254.45. FCH filed for bankruptcy in the spring of 1991, and plaintiffs retained the law firm of Barack, Ferrazzano, Kirschbaum & Perlman (BFKP) to negotiate a settlement with Shearson and preserve plaintiffs' claims in case a settlement failed to materialize. The Illinois Securities Law required plaintiffs to file a rescission notice within six months of learning of their right to a statutory remedy. 815 ILCS 5/13(B) (West 2010). However, BFKP did not file a rescission notice after learning of plaintiffs' right to the statutory remedy, and plaintiffs were later time barred from litigating their Illinois Securities Law claims. *Goldfine v. Steinberg*, No. 1-00-1004 (2004) (unpublished order under Supreme Court Rule 23). Plaintiffs then filed this legal malpractice action against BFKP while simultaneously pursuing other available claims against Shearson. In 2007, plaintiffs settled with Shearson for $3.2 million.

¶ 97    After plaintiffs' settlement with Shearson, plaintiffs litigated their legal malpractice

claims against BFKP in a bench trial. The trial court found that in the underlying claim the Shearson defendants violated the Illinois Securities Law in the last 11 of the plaintiffs' 12 FCH stock purchases, and it found that the law firm was negligent in not filing a timely rescission notice on the legal malpractice claim. The trial court then applied a "proportionate reduction of $3,200,000.00 (71.00693%)" to each of the 11 purchases to obtain a "net" purchase price for each transaction which combined for a total of $1,306,602.29. The trial court lastly calculated an annual interest award of 10% from the date of each sale through May 24, 2011. The resultant award from the Illinois Securities Law claim equaled $4,091,752.19, and plaintiffs recovered an additional $1,843,868.08 in attorney fees and costs for damages.

¶ 98    The majority follows *Kugler v. Southmark Realty Partner III*, 309 Ill. App. 3d 790, 797-98 (1999), in holding that the 10% annual interest award must be calculated on the *full* amount paid for the securities, *before* deductions are made for any income or amounts received by plaintiff. The trial court followed the special concurrence given in *Kugler* by Justice Joseph Gordon. *Kugler*, 309 Ill. App. 3d at 798-99 (Gordon, J., specially concurring). According to the *Kugler* special concurrence, the majority's interpretation of section 13(A) of the Illinois Securities Law of 1953 does not follow the plain language of the statute because such an interpretation strains the meaning of the word "interest" while also conferring a windfall on plaintiffs and leading to an absurd result. *Kugler*, 309 Ill. App. 3d at 798-99 (Gordon, J., specially concurring). In other words, the majority gives the plaintiff a double recovery. *Kugler*, 309 Ill. App. 3d at 798 (Gordon, J., specially concurring) ("Since the purchaser has the use of the money received from the resale, any interest received against that sum would constitute a windfall and an effective double recovery to the purchaser.").

¶ 99    Section 13(A)(1) provides that defendants are jointly and severally liable for the full amount paid, along with accrued interest less any income or other amounts that the purchaser received for the security. 815 ILCS 5/13(A)(1) (West 2010). For purchasers who no longer own the securities, section 13(A)(2) permits recovery of the amounts set forth in clause (1) less any amounts received "for or on account of the disposition of the securities." 815 ILCS 5/13(A)(2) (West 2010). As punishment for an offending party, courts may also grant plaintiffs recovery of attorney fees. 815 ILCS 5/13(A) (West 2010); see also *Foreman v. Holsman*, 10 Ill. 2d 551, 553-54 (1957).

¶ 100   While judicial construction of any statute becomes necessary only when the meaning of the statute is unclear or ambiguous (*Kugler*, 309 Ill. App. 3d at 797), a court must not create rights that do not exist in the statutory language. *Gonzalez v. Profile Sanding Equipment, Inc.*, 333 Ill. App. 3d 680, 693 (2002) (citing *Lemont-Bromberek Combined School District No. 113(a) v. Walter*, 279 Ill. App. 3d 847, 850 (1996)). Also, the court must assume that the legislature did not intend for the statute's provision to produce an absurd result or a double recovery. *Stewart v. Industrial Comm'n*, 115 Ill. 2d 337, 341 (1987) (citing *City of Springfield v. Board of Election Commissioners*, 105 Ill. 2d 336, 341 (1985), and *Fitzsimmons v. Norgle*, 104 Ill. 2d 369, 373 (1984)); see also *Kugler*, 309 Ill. App. 3d at 798 (Gordon, J., specially concurring).

¶ 101   Here, the plain language of the statute does not clearly support the majority's interpretation. By its common definition, the word "interest" constitutes the " 'price paid for

borrowing money generally expressed as a percentage of the amount borrowed paid in one year.' " *Kugler*, 309 Ill. App. 3d at 799 (Gordon, J., specially concurring) (quoting Webster's Third New International Dictionary 1178 (1986)). Interest as a general rule serves a compensatory purpose. See 47 C.J.S. *Interest and Usury* § 4 (2005); compare Black's Law Dictionary 816 (7th ed. 1999) (defining interest as the "*compensation* fixed by agreement or allowed by law for the use or detention of money, or for the loss of money by one who is entitled to its use" (emphasis added)), with Ballentine's Law Dictionary 648 (3d ed. 1969) (defining interest as "*compensation* allowed by law, or fixed by the parties, for the use, detention, or forbearance of money or its equivalent" (emphasis added)). Because the interest therefore correlates with the principal and serves a compensatory purpose under the common definition, the interest accrual is generally expected to cease once the principal is recovered. *Kugler*, 309 Ill. App. 3d at 799 (Gordon, J., specially concurring). Had the legislature intended for the interest to continue to accrue even against principal already recovered by the plaintiff, then it would have explicitly drafted that counterintuitive requirement into the statute. Justice Joseph Gordon's special concurrence does not permit the liable defendant to reap the benefits of obtaining income on the securities gratuitously because the liable defendant still must pay interest against whatever part of the principal the plaintiff has not recovered. By allowing for interest to accrue on principal that has already been recovered, the majority creates for plaintiffs a right that does not exist in the statutory language: namely, a right to recovery beyond the loss incurred from the transactions and attorney fees. Furthermore, plaintiffs were free to dispose of the moneys gained from the settlement with the Shearson defendants as they pleased. The majority's decision allows plaintiffs to collect interest on such moneys already in their possession, thereby giving plaintiffs a double recovery while concurrently permitting them to reap the benefits of such moneys from investments elsewhere.

¶ 102    The legislature could not have intended for section 13(A)'s prohibition of double recovery on amounts received from the securities to permit a double recovery on the interest. To the extent that section 13(A) serves a punitive purpose, it does so by permitting courts to grant plaintiffs recovery for attorney fees. 815 ILCS 5/13(A) (West 2010); see also *Foreman*, 10 Ill. 2d at 553-54. Yet construing the same section to permit recovery beyond losses and litigation expenses would contradict the demonstrably compensatory motivation behind the legislature's decision to subtract from a plaintiff purchaser's recovery any amounts received on the securities or as a result of their disposition. The majority's interpretation, which holds that section 13(A)'s explicit denial of recovery for amounts received nonetheless permits recovery based on the interest of those same amounts, ultimately rests on the assumption that the legislature intended to produce the absurd result of a windfall recovery. I cannot concur with this assumption, and, thus, I must respectfully dissent.